Nicholson, C. J.,
delivered tbe opinion of tbe court:
' Barnard Mitchell died in Madison County, Tennessee, in May, 1859, tbe owner of valuable real estate and a small amount of personal property. He made bis will in 1858, in which be appointed bis “old associate,” Vm. S. Callo-way, to be “bis executor” to “settle and wind up bis affairs.” In June, 1859, Calloway was qualified as executor, and gave bond and security as snob. Mitchell was an old bachelor, having relatives in New York, to whom tbe testator left bis property, after mailing a number of specific bequests, and after the payment of bis debts, -which be stated in his will were then small. He directed bis real estate to be sold on a credit of one, two, and three years. Complainants are tbe legatees and devisees, to whom testator directed his property to be distributed, after tbe payment of bis debts. They filed their bill in April, 1866, *638 against W. S. Calloway as executor, and Ms sureties as such, executor. After making various specific charges of maladministration in the execution of tMs trust, they require 'Calloway to state on oath how much money there was on hand at testator’s death, and what became of it. He was required to set forth and show, item by item, the debts paid by him, 'and when and to whom; and that he produce the books of accounts, and all vouchers and papers throwing light on the affairs of the estate; and an account is' prayed for, etc. The -executor was enjoined from collecting any debts due the estate.
The answer of Calloway is on oath, and is explicit and full in its responses to the several specific allegations, and in detail as to his administration of Ms trust. He says that Mitchell was engaged in carrying on a family grocery store when defendant, about the year 1830, was employed by him as a clerk; that he continued as such clerk at an annual salary, commencing at $300 and Ms board, wMch was soon increased to'$400, and then to $500 and his board, until 1850, when testator quit business and sold out his stock, then much reduced, to defendant, for about $1,400; that at that time testator was indebted to Mm $2,000 for salary, which he paid in cash, to- enable-Mm to renew and supply his stock of goods, taking defendant’s notes on time for the purchase price of the stock; that about 1854 they settled, when defendant had paid off his notes, and from that time until testator’s death, in May, 1859, he was one of defendant’s best customers in the purchase of his goods, and that during the same period testator was engaged in improving several of his vacant lote, in doing which he borrowed of defendant large amounts of money, both of which accounts, for goods sold and for money loaned, from 1854 down to May, 1859, together with an account for the board of testator for about four years, remained unsettled and unpaid at the time of testator’s death.
Defendant states that before testator quit business he *639 bad fallen, into baibits of intemperance and dissipation, wbicb continued to grow on biin until bis death; that be was wasteful of bis means in various ways, and especially in frequent entertainment of large numbers of persons, white and black, in wbicb large quantities of liquors and such articles as are kept in groceries were -bought from defendant and used; that during this time defendant furnished him money to carry on bis improvements, and also furnished him bis board.
He states that at bis death testator bad only a few dollars in cash, and a small quantity of old furniture, this being all of bis personal property except the debts due to him, most of which- — -amounting to about $10,000 — consisted in old worthless accounts wbicb were barred by the statute of limitations or other-wise unavailable.
Defendant filed with bis answer schedules showing all the property of every kind that- came into bis possession, together with the disposition made thereof. He filed also the books of bis testator, and bis own books, showing the items of bis account against testator for money loaned, and for goods sold and delivered to him.
Defendant answered as to the debts due testator collected by him, and bow the same bad been appropriated; bow be had disposed of the personal, effects, and bad appropriated the proceeds. He gave a full statement of the sale by him of the real estate, wbicb sale took place in January, 1860, on a credit of one, two, and three years. He gives the price at wbicb each lot was sold, and there is no- controversy as to the prices being fair and adequate, lie states that three of the lots were purchased by Lyon, at full prices; that soon after the sale Lyon proposed to hfm to take the lots- by paying him $150 for bis bargain; that be declined to do so>, and afterwards be agreed to take the lots at Lyon’s bids, but that be never made Lyon a deed, and got none from Lyon, until after the present bill was filed. He states that upon the belief that the lots belonged to him, *640 be erected valuable bouses on two of them, at a cost of $6.000. The proof on this subject was that Brown, a stepson of defendant, procured Lyon to bid off the lots for him, but afterwards concluded not to take them, and got Lyon to induce defendant to take them at his bid. They were bid off, however, at their full value.
Defendant further states that he did- not sell one of the lots, which he describes as one with a framed house on it, at the intersection of Lafayette street and Suck alley, for the reason that testator made a parol gift of it to him in 3 851, and put him in possession thereof, which possession he had ever since held adversely to' testator and all others, with the knowlédge of the testator. This statement in the answer is fully sustained by the proof.
The cause was heard by the chancellor, Muse, at the March term, 1870, upon the pleadings, exhibits, and proof, when, among other matters not necessary to be noticed here, he decreed that defendant Calloway obtained no- valid title to the three lots purchased by Lyon, and afterwards agreed to be taken by defendant, and that said sale and purchase wea*e null and void. IT-e decreed that defendant was liable-to account for the rents of the houses placed by him on the two unimproved lots, but was entitled to- be- allowed the amount of the enhancement in the value- of the lots, by reason of the permanent improvements, but this amount not to exceed the amount of the rents. Ha held that if the amount of the enhancement should exceed the- rents, the excess should not be allowed as a set-off against the rent of the third lot, called the “up town lot,” which was improved when bid off by Lyon.
He decreed that the three lots so bid off by Lyon should be sold by the clerk and master on a credit of one, two, and three years, which was afterwards done, and the report of sale confirmed. The chancellor further held, and so decreed, that defendant Calloway had a possessory right to tli9 lot at the intersection of Lafayette street an-d Suck *641 alley, by reason of a parol gift thereof by testator, and the continued adverse possession by defendant.
The chancellor then proceeded to order an account, among other things, as to the value of the enhancement of the two lots bid off by Lyon, by reason of the permanent improvements placed thereon by defendant; and also of the rents which defendant had received or ought to have received thereon, as well as on the third lot, called the “up town lot.” And also an account of all debts due to and owing by the testator at the time of his death, reserving the question as to defendant’s right to. retain for any debt-due to him, and all other questions not already determined.
We are of opinion that the chancellor held correctly that defendant Calloway got no valid title to the three lots hid off by Lyon, and his decree setting aside that sale and ordering a sale of the lots is affirmed. As also his decree as to the possessory right of defendant to the lot at the intersection of Lafayette street and Suck alley. The proof shows clearly a parol gift of the property to- defendant by testator, and a continuous possession under that gift, with the recognition by testator of the- claim from 1851 down to his death in 1859. This- gave to- defendant a possessory right to the property, which is protected by the second section of the act of limitations of 1819.
We ai*e further of opinion that the chancellor held correctly that defendant Calloway was entitled to have set off against the rents thereof, hut not to- have any excess of that enhanced value over the rents, set off against the rents of the “up- town lot,” on which he had made no' improvements.
The clerk and master made a detailed report in pursuance of the order of reference, which it is only necessary to notice so far as it was excepted to. He reported the total amount for which defendant as executor was liable, counting interest to the date of the report, 17th of October, 1870, to be about $15,072, and the amount of testator’s indebted *642 ness to defendant for money borrowed, goods sold and delivered, and board, counting interest to 17 th October, 1870, to be about $16,028, showing a balance in favor of the defendant of about $1,000. But among the: liabilities as reported against defendant is an amount of about $2,175, made up of the several notes of Joe D. Mason, which were in suit when complainants filed their bill, and the collection of which was enjoined. As this amount did not come into defendant’s hands, by operation of the injunction pro^cured by complainants, it was not properly embraced in the order of reference, and therefore improperly charged to. defendant as a liability. This amount should bei deducted from defendant’s liability, which will make the amount due to defendant about $8,175 instead of about $1,000, as reported by the clerk and master.
Complainants excepted to> the allowance by the clerk and master of the claims of defendant for money loaned and goods sold to testator, and for board of testator, upon two grounds, first, because they were not sustained by the proof, and, second, because they were barred by the statutes of limitation of two and six years. Chancellor Fent-ress sustained the exceptions, but on what ground does not appear, and gave a judgment against defendant for about $11,500.
The cause is in this court by writ of error by defendant.
The first question for consideration is, whether the proof sustained the report of the clerk and master as to. the validity of the claims of defendant Calloway against the estate of his testator.
In the attitude in which the question is presented under the pleadings, the answer of defendant on oath, so. far as it is responsive to the allegations and prayer of the bill for discovery, becomes evidence for him, and must prevail unless overcome by the proof made by complainants. Woodcock v. Bennett, 1 Cowen, 744; [Lindsley v. James, 3 Cold., 477.
*643 In tbe bill defendant is required to malt© discovery, by producing Ms vouchers and books, as to tbe indebtedness of tbe testator to him. He produces Ms claims as made out and sworn to before a justice of tbe peace in August, 1859, Avbich was only about two months after Ms qualification as executor. He produces also bis own books and those of tbe testator, ivhich support bis claims as made out aud sworn to in August, 1859. These books were evidence for defendant. Apperson v. Harris, MS. opinion, Jackson, 1873.
As to tbe claim for borrowed money, it appears- from tbe books of testator that every item of tbe charge is there entered by tbe testator in bis own bandwriting, showing that be ivas indebted to defendant for borrowed money in tbe several amounts specified.
It is further proved by B. "W. May that within a year of testator’s death he was speaking to witness about the expense of building, and showed him the books, in which testator bad charged himself with money borrowed of defendant for carrying on his building, and by so doing be bad kept defendant pretty tight run, and that be Mmself could not collect money.
These are tbe books from which witness May drew off tbe account for defendant, which is made part of bis answer.'
Several other witnesses prove that they were present on different occasions when testator borrowed money from defendant in various amounts. The claim for borrowed money is therefore fully and abundantly proven outside of the evidence furnished by defendant’s answer.
Tbe claim for articles of goods sold and delivered rests upon the evidence furnished by defendant’s responsive answer, upon his original books called for by complainants, upon tbe copies of the accounts made out and sworn to by defendant soon after Ms qualification, which correspond with the original books, and upon the testimony of many *644 witnesses, wbo prove that on account of the habits of testator in giving frequent promiscuous entertainments he required such articles as are charged to him, and that he did often buy and receive such articles from defendant during the several years from 1854 to 1859. The articles so proven to have been bought were liquors, nuts, candies, oysters, sardines, cigars, tobacco, etc.
It is in proof by many witnesses that the testator was an old bachelor, living in a room by himself, near to the business house of defendant; that after quitting business his habits were wasteful, being addicted to constant intemperance, and on Sundays and nights having around him large crowds of persons, white and black, furnishing them with liquors and all the various articles kept in family groceries. In view of his habits of dissipation and extravagance in entertaining company, and in leaving his room open to robberies, which were frequent, we are of opinion that it is not unreasonable that the testator should have bought and squandered the amounts claimed by defendant. It is argued that defendant did not have the means to make the advances claimed by him. He was testator’s clerk for about twenty years, on a salary at first of $300, then of $400, and then of $500, with his board furnished. It is not unreasonable that by economy in his habits defendant’ should in 1850 have accumulated an amount sufficient to carry on the grocery business with success and profit, and that defendant was faithful and economical is abundantly shown by the record. We think that the record shows that defendant did a profitable business from 1851 until 1859, and we see nothing in the proof which shows that defendant could not have had the means to make the loans of money and the sales of goods, which ara fully shown to have been made. The proof is full as to the extravagant and wasteful habits of testator, and as to his being in frequent need of money, both in indulging his extravagant whims and in carrying on hia. improve *645 ments. It is also fully proven that his main reliance, for money was on defendant, as he was unable to. make collections of his own claims, which were large, but which from long indulgence to his debtors had become worthless to the amount of about $10,000.
After carefully examining the proof, we are unable to discover any ground upon which we can hold that the claim of defendant, either for money loaned or for goods sold, is not satisfactorily established, nor do we see any evidence which impeaches the integrity or fidelity of defendant.
We are further of opinion that defendant’s claim for board from 1854 to 1859 is fully proven, -both, as to the services rendered and their value. In coming to this conclusion we have not considered the deposition of defendant himself, which was taken at a -time when he was a competent witness, but when his deposition was offered on the hearing, his testimony as to conversations or transactions with his testator had been rendered incompetent by subsequent legislation. The chancellor overruled the objection to the deposition and allowed it to- be read. As it does not appear that the chancellor required defendant to testify in the case, as he had a right to do, we are of opinion that it was error to allow the deposition to he read, except as to matters not detailing conversations or transactions with testator. But as already stated, we are of opinion that the validity of defendant’s claim was sustained without reference to defendant’s own testimony, which was given in support of his answer.
The next question is, whether defendant’s claims were barred hy the statutes of limitations either of six years or of. two year’s and six months. The accounts commenced in 1854, and testator died in May, 1859. It is thus clear that they were valid subsisting claims at the death of testator. Defendant was qualified as executor in June, 1859, and it is conceded by him that he had mad® m> statement with the county court prior to 1866, when the bill wa? filed.
*646 It is insisted that by reason of the direction in the will of testator that his real estate should be sold for distribution among his legatees, it was thereby converted into' personalty and became legal assets, and therefore subject tO' the rule that an administrator or executor must malee his claim for a retainer within two years and six months, otherwise he is barred. In the view we take of tire character of the assets, arising from the sale of the lands, it is not necessary to decide whether the defendant would be defeated of his right of retainer, if the proceeds of the real estate is to be regarded as legal assets.
Wa understand the law to have been settled in this state, since the case of Hughlett v. Hughlett, 5 Hump., 469 (except during the time that the act of 1838 was in force), that lands devised to be sold for the payment of debts or legacies are not administrate as legal assets; that the executor acts in relation to them as trustee, and not as executor of personal effects; that no suit can be brought at law in relation thereto,’nor in the ecclesiastical courts; that they axe equitable assets, cognizable only in a court of chancery; that the executor is not bound to return them in his inventory to the court of ordinary; that neither the oath of an executor nor the bond of an administrator with the will annexed extends to them, but are confined exclusively to those duties which devolve upon them purely in the character of executor or administrator and which the ordinary has the right to exact the performance of. We have repeatedly recognized and followed this as the true rule on the subject within the last few years. The clause in the will of Hughlett, on which the court laid down the rule stated, was as-follows: “All the balance of my estate, both real and personal .... that is not already disposed of, I will and require that my executor should take and convert into money immediately, and therefrom to pay and discharge all just demands, etc., after that is done to pay to the legatees their distributive shares,” etc.
*647 Tbe testator in the present case died in May, 1859, and defendant was qualified as executor in June, 1859. The act of 1838 was not re-enacted by the Code, so that the law continues now as it was when the case of Hughlett v. Hughlett was decided.
In the present case, after appointing defendant Calloway as “executor to settle and wind up his affairs,” testator directs “that his real estate be sold on a credit of one, two, and three years.” He then says: “After my debts are paid, which at present are but small, I wish the balance to be applied” tó the various legatees named. He closes his will as follows: “What notes and accounts are due me I wish to be collected and the. proceeds applied to. my relations.” It thus appeals that the clauses in 'the two wills are substantially alike.
It is manifest that the testator intended his debts to be first paid, before any of his legatees would be entitled to their bequests out of the proceeds of the real estate; it was the balance after payment of debts that was to be distributed by his executor. It would seem that when the testator made his will, which was in 1858, he supposed his debts were small. In this it is clearly shown that' he was mistaken. But this is immaterial. His debts were first to be paid whether large or small, before “the balance.” was to be distributed.
We think it clear that by the terms of his will testator made his debts a charge on all his real estate. In Hill on Trustees. 345, it is said: “It has been settled by a series of cases, commencing from a very early period,.and continuing down to the present time, that a general introductory or prefatory direction by a testator for the payment of debts, followed by a disposition of the real and personal estate, will amount to a trust for the discharge of the debts, if necessary, out of the real estate.” And on page 348 it is said: “Where a testator directs his real estate to be sold in such terms as to convert it absolutely into personal *648 estate, and then bequeath his personal estate after payment of his debts, the produce of idle real estate will be liable to the'payment of the debts.” 2 Story’s Eq., secs. 1245, 1247.
Tt follows that all the debts of testator that were valid and subsisting at the time of his death were made a charge on his real estate by his will. -And it is settled that a charge by will for the payment of debts out of real estate will prevent the statute of limitations from running against such debts as were valid and subsisting at his death. Hill on Trustees, 341.
But we deem it unnecessary to pursue, the discussion further, as we regard the decision of the case of Harrison v. Henderson, 7 Heis., 329, as conclusive. In that case Judge Ereeman said: “Land even devised to"be sold specifically to pay debts would not come within the rule, though a court of equity in such cases would treat the land as money. Yet being equitable assets as contradistinguished from legal, the doctrine of retainer at common law would have no application.”
It follows that as there were no legal assets- of which defendant could retain his debts, and as he could not retain it out of the equitable assets arising from the sale of the land, but could only do so through the chancery court, the statute of limitations has no application to his claims, and he is now entitled to' have his claims allowed for satisfaction out of the proceeds of the real estate.
The decree of the chancellor sustaining the exceptions of complainants will be reversed, as well as the decree rendered thereon, and the report of the clerk and master, modified as hereinbefore indicated, will be affirmed and a decree be entered accordingly. The costs of the cause will be paid out of the assets of the estate.
In the case of Philander Mitchell and others v. W. S. Calloway and others, filed to enforce the decree of the chancellor in the former case by selling the equitable interest of W. S. Calloway in certain real property therein described, we are of opinion that the bill was filed pre *649 maturely, and as it now appears that complainants have no cause of action against defendant, their bill is dismissed with costs.
In the case, of the bill of review filed by W. S. Calloway and others v. Philander Mitchell and others, we are of opinion the demurrer to the bill was properly sustained.
The decree dismissing the bill is affirmed with costs.